UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

THE LIVERY ROUND TABLE, INC., BLACK
CAR ASSISTANCE CORP., THE NEW YORK
BLACK CAR OPERATORS INJURY
COMPENSATION FUND, LIMO ASSOCIATION
OF NEW YORK, INC., LIVERY BASE
OWNERS, INC., FAST OPERATING CORP.
d/b/a CARMEL CAR & LIMOUSINE
SERVICE, and REUVEN BLECHER,

              **Plaintiffs,**

      - against -

NEW YORK CITY FHV AND LIMOUSINE
COMMISSION, MEERA JOSHI, in her
official capacity as Chair and Chief
Executive Officer of the New York
City Taxi and Limousine Commission,
and THE CITY OF NEW YORK,

              **Defendants.**

18-cv-2349 (JGK)

<u>MEMORANDUM OPINION &
ORDER</u>

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC# _____
DATE FILED: 4/18/18

---

**JOHN G. KOELTL, District Judge:**

The plaintiffs, an operator of a for-hire taxi, an owner of a for-hire-taxi base company, and related trade associations, seek a preliminary injunction against the New York City Taxi and Limousine Commission (the "Commission"), Meera Joshi in her official capacity as the Commission's chair and chief executive officer, and the City of the New York enjoining the implementation of Rules 59A-11(e), 59B-17(c), and 59B-17(d) of title 35 of the Rules of the City of New York, as amended by the Commission on December 13, 2017. The challenged Rules principally set new requirements for the number of trips in

which a dispatch base for For-Hire Vehicles ("FHVs") must dispatch a wheelchair-accessible vehicle (a "WAV"). The plaintiffs must begin to comply with the amended Rules by July 1, 2018. They have sued the defendants for a declaratory judgment that the amended Rules are unlawful because they allegedly: violate 42 U.S.C. § 1983 and The Americans with Disabilities Act of 1990 (the "ADA"), Pub. L. No. 101-336, 104 Stat. 328 (codified as amended at 42 U.S.C. § 12101 et seq.); violate the Equal Protection Clause and the Dormant Commerce Clause of the United States Constitution; are barred by estoppel; and violate the New York State Constitution. The plaintiffs filed the present motion for a preliminary injunction on March 16, 2018, arguing that the challenged Rules are preempted by the ADA and violate separation of powers principles.

The Court held an evidentiary hearing on the plaintiffs' motion on April 16, 2018. The plaintiffs called two witnesses at the hearing -- Dr. Avik Kabessa, the chief executive officer of Fast Operating Corp. (which does business as Carmel Car and Limousine Service) and founder of a non-profit organization comprised of four livery associations and two of the largest livery bases in New York City, and Reuven Blecher, an FHV driver who does not drive a WAV. The defendants did not call any witnesses at the hearing. Disabled in Action, Mobilization for

2

Justice, New York Lawyers for the Public Interest, and United Spinal Association also filed a brief as amici curiae in opposition to the plaintiffs' motion.

Having reviewed the evidence and arguments submitted by the parties, the Court now makes the following findings of fact and reaches the following conclusions of law. For the following reasons, the plaintiffs' motion is **denied**.

## FINDINGS OF FACT

### A.

1. The plaintiffs consist of an operator of a licensed for-hire livery vehicle, an owner of a licensed FHV dispatch base company, and three trade associations that represent operators and owners of for-hire livery, black car, and luxury limousine FHVs and FHV bases. Kabessa Decl. ¶¶ 3, 6; Goldstein Decl. ¶ 1; Rose Decl. ¶¶ 1-2; Blecher Decl. ¶ 1.

2. The defendants consist of the City of New York, the Commission, which is an executive agency of the City created by section 2300 of the New York City Charter, and Joshi in her official capacity as the Commission's chair and chief executive officer.

3. On July 7, 2017, the Commission published notice of proposed amendments to Rules 59A-11(e), 59B-17(c), and 59B-17(d) of title 35 of the Rules of the City of New York, which deal with wheelchair-accessible FHVs. Goldberg-Cahn Decl. ¶ 3, Ex. A.

4. On September 28, 2017, the Commission held a public hearing regarding these proposed amendments. Id. ¶ 4.

5. On December 8, 2017, the Commission published on its website a public notice of intent to consider a proposal for a pilot program to test response times for wheelchair-accessible FHV services. Id. ¶ 7, Ex. B.

6. On December 13, 2017, the Commission held a public hearing during which the proposed amendments to Rules 59A-11(e), 59B-17(c), and 59B-17(d) were discussed and adopted. The final versions of these Rules were published on December 20, 2017. Id. ¶¶ 5, 6.

7. The published Rules contained the following statement of basis and purpose: "Increasing access to the New York City Taxi and Limousine Commission's fleet of over 110,000 license vehicles is an important step to make New York City a place that is truly accessible to all of our residents and visitors, including those who use wheelchairs. . . . To reach the for-hire vehicle sector (black cars, car services and luxury limousines), which today transports 400,000 passengers each day, the [Commission] promulgates an accessible service requirement that would put wheelchair accessible [FHVs] in circulation and available for passengers who need them." Id. Ex. C, at 3-4.

8. Also at the December 13, 2017, hearing, the Commission discussed and approved the proposed pilot program regarding

response times for wheelchair-accessible FHV services. The pilot program will run for two years beginning July 1, 2018. Id. ¶¶ 7, 8.

**B.**

9. Rule 59A-11(e) of title 35 of the Rules of the City of New York provides that an owner of a licensed FHV generally may not dispatch or permit another person to dispatch the owner's vehicle unless (1) the vehicle is affiliated with a validly licensed FHV base, (2) the base dispatching the vehicle is validly licensed, and (3) the vehicle is being dispatched from its affiliated base. The third requirement of Rule 59A-11(e) is subject to two disjunctive exceptions. One of the exceptions formerly provided that a vehicle need not be dispatched from its affiliated base if "[t]he vehicle is an Accessible Vehicle being dispatched to transport a Person with a Disability pursuant to a contract executed under section 59B-17(c) of these Rules." On December 13, 2017, the Commission amended that exception to provide that a vehicle need not be dispatched from its affiliated base if "[t]he Vehicle is an Accessible Vehicle affiliated with a For-Hire Base." Id. Ex. C, at 4.

10. The penalty for violating Rule 59A-11(e) is a fine of $400. Id.

11. Rule 59B-17(c) of title 35 of the Rules of the City of New York requires owners of licensed FHV bases to provide

5

transportation services to individuals with disabilities. On December 13, 2017, the Commission amended Rule 59B-17(c)(1) to require each base to dispatch WAVs on at least five percent of total trips dispatched by the base between July 1, 2018, and June 30, 2019. The percentage of trips for which a base is required to dispatch WAVs under the amended Rule 59B-17(c)(1) increases incrementally over the next four years, eventually requiring a WAV for twenty-five percent of a base's yearly dispatched trips beginning on July 1, 2022. Id.

12. The penalty for violating amended Rule 59B-17(c)(1) is a fine of "$50 for each 100 trips by which the Base misses the percentage of trips it was required to dispatch to Accessible Vehicles in that calendar year." "If a Base fails to dispatch enough trips to Accessible Vehicles to meet at least half of its percentage requirement, the Commission may seek suspension of up to 30 days or revocation." Id.

13. Amended Rule 59B-17(c)(3) also provides: "Every year beginning July 1, 2019, the Commission will review Base compliance levels, service levels, and any other information it deems relevant to determine if adjustments need to be made to the percentages set forth in paragraph (1) of this subdivision." Id.

14. Rule 59B-17(d) of title 35 of the Rules of the City of New York is similar to Rule 59A-11(e). Among other things, it

provides flexibility to FHV bases in dispatching WAVs affiliated with other bases. Rule 59B-17(d) provides that a base owner generally may not dispatch a vehicle not associated with the base. There are three disjunctive exceptions to this Rule. One of the exceptions formerly provided that a base may dispatch a vehicle not associated with the base if the dispatched vehicle is "an Accessible Vehicle from a[nother] Base it has contracted with to provide accessible transportation pursuant to Section 59B-17(c) of these Rules." On December 13, 2017, the Commission amended that exception to provide that a base may dispatch a vehicle not associated with the base if the dispatched vehicle is "an Accessible Vehicle affiliated with a For-Hire Base and the Base Owner provides the customer with the name and license number of both the affiliated Base and the dispatching Base (clearly identifying which Base is the affiliated Base and which Base is the dispatching Base) in all communications with the customer and any materials or receipts provided to the customer." Id. at 4-5.

15. The penalty for violating Rule 59B-17(d) is a fine of $150. Id. at 5.

16. An FHV base may apply to participate in the two-year pilot program adopted by the Commission on December 13, 2017, instead of complying with amended Rule 59B-17(c)(1), which requires a minimum number of trips to be provided with WAVs.

Bases must satisfy various pre-qualification conditions to apply for the pilot program and must be selected to participate by the Commission. Id. Ex. D.

17. There are two roles available to bases in the pilot program. Id. at 1-2.

18. At least one base must participate in the pilot program as a "WAV Dispatcher." A WAV Dispatcher will be "responsible for receiving requests for [WAVs] from Participating Bases and dispatching [WAVs] to fulfill at least sixty percent (60%) of those requests in under 15 minutes and ninety percent (90%) of those requests in under 30 minutes by the end of the first year of the Pilot Program and at least eighty percent (80%) of those requests in under 15 minutes and ninety percent (90%) of those requests in under 30 minutes by the end of the second year of the Pilot Program." Id. at 2.

19. The Commission will select at least one and no more than three WAV Dispatchers from the bases that apply. Id. at 4.

20. Other bases may participate in the pilot program as "Participating Bases." A Participating Base will be "responsible for receiving [WAV] requests from passengers, sending requests for [WAVs] to the [WAV] Dispatcher, cooperating with the [WAV] Dispatcher, and ensuring that the [WAV] Dispatcher has the resources necessary to meet the response-time metric." Id. at 1. The Commission will select at least ten Participating Bases from

those that apply; there is no maximum number of Participating Bases. Id. at 4.

## CONCLUSIONS OF LAW

1. The plaintiffs seek a preliminarily injunction preventing the implementation of Rules 59A-11(e), 59B-17(c), and 59B-17(d), as amended by the Commission on December 13, 2017.

2. "A party seeking to enjoin governmental action taken in the public interest pursuant to a statutory or regulatory scheme" must establish (1) a likelihood of success on the merits of their claims, (2) that an injunction is in the public interest, and (3) that they will suffer irreparable harm in the absence of preliminary relief. Oneida Nation of N.Y. v. Cuomo, 645 F.3d 154, 164 (2d Cir. 2011) (internal quotation marks omitted).[1]

---

[1] The defendants assert that the plaintiffs must demonstrate a "clear" or "substantial" likelihood of success on the merits. See Hoblock v. Albany Cnty. Bd. of Elections, 422 F.3d 77, 97 (2d Cir. 2005) (requiring the movant to demonstrate "clear or substantial likelihood of success" because the movant sought "a mandatory injunction (one that will alter the status quo)"). While that heightened standard of likelihood applies when an injunction is mandatory rather than prohibitory, it is sometimes unclear whether an injunction is mandatory or prohibitory. See Jolly v. Coughlin, 76 F.3d 468, 473-74 (2d Cir. 1996). In this case, the injunction seeks to prevent a regulation from taking effect and requires no affirmative action. It is therefore unnecessary to determine whether the plaintiffs' claims in this case must meet the "clear" or "substantial" likelihood of success standard because the plaintiffs have failed to show that there is any likelihood that their claims will prevail.

**A.**

1.   The plaintiffs are unlikely to prevail in arguing that amended Rules 59A-11(e), 59B-17(c), and 59B-17(d) are preempted by the ADA and violate the New York State Constitution.

**1.**

2.   The plaintiffs assert that the amended Rules are preempted by section 304(b)(3) of the ADA, codified at 42 U.S.C. § 12184(b)(3), and an associated regulation promulgated by the Department of Transportation, codified at 49 C.F.R. § 37.29(b).

3.   The plaintiffs begin by arguing that the defendants are estopped from asserting that the amended Rules are not preempted by federal law because that would be contrary to a position the Commission took in Noel v. New York City Taxi & Limousine Commission, 687 F.3d 63 (2d Cir. 2012).

4.   The federal doctrine of judicial estoppel bars a party from "tak[ing] a position that is inconsistent with one taken in a prior proceeding" if the first position was "adopted by the tribunal to which it was advanced." Stichting Ter Behartiging Van de Belangen Van Oudaandeelhouders In Het Kapitaal Van Saybolt Int'l B.V. v. Schreiber, 407 F.3d 34, 45 (2d Cir. 2005). "[A] court must carefully consider the contexts in which apparently contradictory statements are made to determine if there is, in fact, direct and irreconcilable contradiction." Rodal v. Anesthesia Grp. of Onondaga, P.C., 369 F.3d 113, 119

(2d Cir. 2004); see also Intellivision v. Microsoft Corp., 784 F. Supp. 2d 356, 363 (S.D.N.Y. 2011), aff'd, 484 F. App'x 616 (2d Cir. 2012).

5. In Noel, "[t]wo people who use wheelchairs and the organizations that represent persons with disabilities" sued the Commission for allegedly violating Title II of the ADA "by failing to provide meaningful access to FHV services for persons with disabilities." 687 F.3d at 65. The Commission asserted that it could not be liable under the ADA because Title III "expressly exempts taxi providers from purchasing or leasing 'accessible automobiles.' " Id. at 73 (quoting 49 C.F.R. § 37.29(b)). The Second Circuit Court of Appeals ultimately agreed with the Commission that the FHV industry as a whole is "exempt" from ADA liability. Id.

6. In this case, the Commission argues that the ADA does not prevent it from promulgating regulations designed to increase the number of WAVs dispatched. That is not contrary to the Commission's position in Noel that it is not liable under the ADA for any failure to provide wheelchair-accessible FHV services. There was no discussion of preemption and no discussion of whether the Commission could lawfully increase access to FHV services for persons with disabilities. Put differently, Noel was about what accommodations the ADA requires the Commission to extend to persons with disabilities, whereas

11

this case is about what protections the ADA permits the Commission to extend to persons with disabilities. The Commission can take a limited view of what federal law requires it to do and simultaneously take a robust view of what federal law permits it to do without creating a "direct and irreconcilable contradiction" between those positions. See Rodal, 369 F.3d at 119-20. Accordingly, the Commission's prior argument in Noel that it was not liable under the ADA does not mean it is judicially estopped from disputing that the ADA preempts its amended Rules in this case.

7.     Turning to the merits of the plaintiffs' argument, it is plain that the plaintiffs have failed to show that the ADA preempts the amended Rules.

8.     The ADA has an express savings clause, which provides in relevant part: "Nothing in this chapter shall be construed to invalidate or limit the remedies, rights, and procedures of any Federal law or law of any State or political subdivision of any State or jurisdiction that provides greater or equal protection for the rights of individuals with disabilities than are afforded by this chapter." 42 U.S.C. § 12201(b) (emphasis added). That provision alone dooms the plaintiffs' assertion that the ADA "invalidate[s] or limit[s] the remedies, rights, and procedures" of the Commission's amended Rules, and makes any preemption claims in this case untenable. See Francis v. Lo-Do

<u>Corp.</u>, No. 14-cv-5422, 2014 WL 7180091, at *1-*2 (S.D.N.Y. Dec. 5, 2014).[2]

9. Even aside from the ADA's savings clause, the plaintiffs' preemption claims cannot be reconciled with the plain language of section 304(b)(3) of the ADA or the plain language of 49 C.F.R. § 37.29(b).

10. Section 304 of the ADA cannot be read to preempt amended Rules 59A-11(e), 59B-17(c), and 59B-17(d). Section 304(a) of the ADA provides as a general rule: "No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of specified public transportation services provided by a private entity that is primarily engaged in the business of transporting people and whose operations affect commerce." 42 U.S.C. § 12184(a). Section 304(b)(3) of the ADA is a definitional provision that provides in relevant part: "For purposes of [section 304](a) . . . , discrimination includes-- . . . . the purchase or lease by such entity of a new vehicle (other than an automobile, a van with a seating capacity of less than 8 passengers, including the driver, or an

---

[2] When asked at argument if there is any case in which a court found that the ADA preempted a state law or regulation providing greater accommodations for persons with disabilities notwithstanding the statute's savings clause, the plaintiffs cited <u>Lopez v. Jet Blue Airways</u>, 662 F.3d 593 (2d Cir. 2011). In that decision, as in <u>Noel</u>, the Court of Appeals held that the plaintiff did not state claims of ADA liability against the defendant because of certain exceptions in the ADA. <u>Lopez</u>, 662 F.3d at 598-99. Nothing in that decision deals with preemption or the ADA's savings clause.

over-the-road bus) . . . ." Id. § 12184(b)(3). See generally Toomer v. City Cab, 443 F.3d 1191, 1193–94 (10th Cir. 2006) (describing the structure of section 304 of the ADA).

11. The plaintiffs argue that the parenthetical carveout in section 304(b)(3) that provides "other than an automobile, a van with a seating capacity of less than 8 passengers, including the driver" acts as an immunity provision for the FHV industry and prevents the Commission from promulgating the amended Rules. That badly misreads the purpose and effect of section 304(b)(3). The sole purpose of section 304(b)(3) is to make clear that purchasing or leasing "an automobile, a van with a seating capacity of less than 8 passengers, including the driver, or an over-the-road bus" does not constitute "discrimination" under section 304(a). Section 304(b)(3) has nothing to say about whether a State or locality may enact its own rules to require individuals or entities who provide licensed transportation to purchase or lease an automobile, a van with a seating capacity of fewer than eight passengers, including the driver, or an over-the-road bus in a manner that makes transportation available to persons with disabilities.

12. The plaintiffs' argument that 49 C.F.R. § 37.29(b) preempts the Commission's amended Rules fares no better. That regulation states in relevant part that federal law does not require "[p]roviders of FHV service . . . to purchase or lease

accessible automobiles" or "to purchase vehicles other than automobiles in order to have a number of accessible vehicles in its fleet." 49 C.F.R. § 37.29(b); see Noel, 687 F.3d at 73-74. As with section 304(b)(3), 49 C.F.R. § 37.29(b) has nothing to say about whether State or local law may require providers of FHV services to purchase or lease accessible automobiles or other accessible vehicles.

13. Accordingly, the plaintiffs are unlikely to prevail in arguing that amended Rules 59A-11(e), 59B-17(c), and 59B-17(d) are preempted by the ADA or any of the ADA's implementing regulations.[3]

**2.**

14. The plaintiffs argue that amended Rules 59A-11(e), 59B-17(c), and 59B-17(d) violate separation of powers principles.

---

[3] The plaintiffs are not likely to prevail on this argument whether it is raised in the context of their declaratory judgment claims or in the context of their claims under 42 U.S.C. § 1983. The plaintiffs argue that their preemption argument establishes that the amended Rules violate the Supremacy Clause. Because there is no preemption, there is no violation of the Supremacy Clause. To have a claim under § 1983, the plaintiffs must show initially that they have been deprived of a right, privilege or immunity under the Constitution or federal law, which they have failed to do. Moreover, the plaintiffs have failed to explain how all of the requirements of a claim under § 1983 have been satisfied. See, e.g., Gonzaga Univ. v. Doe, 536 U.S. 273, 282 (2002) ("[T]o seek redress through § 1983, . . . a plaintiff must assert the violation of a federal right, not merely a violation of federal law." (quoting Blessing v. Freestone, 520 U.S. 329, 340 (1997)) (alteration in original)).

15.  To the extent the plaintiffs intend to argue that the amended Rules violate federal separation of powers principles, their argument would have no merit. The plaintiffs do not claim any violation of separation of powers among branches of the federal government.

16.  The plaintiffs stated at oral argument that the Commission's power to promulgate the amended Rules violates the Guarantee Clause of the Constitution, which requires the federal government to "guarantee to every State in this Union a Republican Form of Government." U.S. Const. art. IV, § 4. The plaintiffs did not rely on this argument or even cite this constitutional provision in their opening brief, which would be reason enough to reject the argument. In any event, the plaintiffs have provided no specific arguments with respect to how the amended Rules violate the Guarantee Clause, why they have sued the municipal defendants rather than the federal government for any violation of the Guarantee Clause, or why the Court should reach the merits of any Guarantee Clause claims which normally raise non-justiciable political questions. See New York v. United States, 505 U.S. 144, 183-86 (1992).

17.  The plaintiffs also asserted at oral argument for the first time that the amended Rules give rise to claims under a so-called federal doctrine of "legislative due process." The plaintiffs did not allege any "legislative due process" claim in

their Complaint or in their opening brief, which would again be sufficient reason to reject it. And to the extent such a claim has ever been raised before, the Second Circuit Court of Appeals has rejected it, explaining that an individual citizen "cannot successfully challenge a legislative act on procedural due process grounds" because "[w]hen the legislature passes a law which affects a general class of persons, those persons have all received procedural due process -- the legislative process." Richmond Boro Gun Club, Inc. v. City of New York, 97 F.3d 681, 689 (2d Cir. 1996); see also Nat'l Shooting Sports Found. Inv. v. Malloy, 986 F. Supp. 2d 118, 124 (D. Conn. 2013) ("[L]egislative due process claims asserted in the present suit are, in fact, classic instances of the sort of generalized grievances rejected by the Supreme Court and this Circuit on numerous occasions." (internal quotation marks omitted)).

18. The plaintiffs' separation of powers claims will also likely fail to the extent they arise under the New York State Constitution. The plaintiffs argue that the delegation of authority under section 2300 of the New York City Charter to the Commission to promulgate regulations is an unconstitutional delegation of legislative powers to an executive agency.

19. The plaintiffs' broadside assault on the authority of the Commission to promulgate any regulations is unlikely to prevail. Section 2300 of the New York City Charter was adopted

in 1971. As plaintiffs' counsel conceded at oral argument, since the Commission's inception, New York State courts and federal courts in this Circuit have issued numerous decisions approving regulations promulgated by the Commission without any suggestion that the Commission's authority to adopt those rules is constitutionally infirm. See, e.g., Statharos v. N.Y.C. Taxi & Limousine Comm'n, 198 F.3d 317, 321-22 (2d Cir. 1999); Greater N.Y. Taxi Ass'n v. N.Y.C. Taxi & Limousine Comm'n, 36 N.E.3d 632, 636-40 (N.Y. 2015); Pavle-Marty Cab Corp. v. City of New York, 399 N.E.2d 945, 946 (N.Y. 1979); Black Car Assistance Corp. v. City of New York, 973 N.Y.S.2d 627, 628-29 (1st Dep't 2013). It would be extraordinary for this Court to hold at the end of this case that every act of the Commission, which has existed for nearly fifty years without its authority in question, has been unconstitutional.

20. Applying the New York State non-delegation doctrine to section 2300 of the New York City Charter, it becomes even clearer that the plaintiffs are unlikely to undermine the Commission's powers.

21. New York law permits "[a] legislature [to] enact a general statutory provision and delegate power to an agency to fill in the details, as long as reasonable safeguards and guidelines are provided to the agency." Greater N.Y. Taxi Ass'n, 36 N.E.3d at 637. There are four factors to consider under New

York law to determine whether a delegation by a legislature to an executive agency is constitutional: (1) whether the agency is making value judgments based on its own views of sound public policy rather than carrying out goals set by the legislature; (2) whether the agency is "fill[ing] in the details of broad legislation" or writing "on a clean slate [and] creating its own comprehensive set of rules without benefit of legislative guidance"; (3) whether "the agency acted in an area in which the [l]egislature had repeatedly tried -- and failed -- to reach agreement in the face of substantial public debate and vigorous lobbying by a variety of interested factions"; and (4) whether the agency was required to use "special expertise or technical competence" in its acts. Boreali v. Axelrod, 517 N.E.2d 1350, 1355-56 (N.Y. 1987). "These factors are not mandatory, need not be weighed evenly, and are essentially guidelines for conducting an analysis of an agency's exercise of power." Greater N.Y. Taxi Ass'n, 36 N.E.3d at 640.

22. With respect to the first factor, the plaintiffs argue that the Commission arrogated policymaking powers to itself by adopting the amended Rules. However, section 2303(a) of the New York City Charter authorizes the Commission to "regulat[e] and supervis[e] . . . the business and industry of transportation of persons by licensed vehicles for hire in [New York City]." Section 2303(b)(2) specifies that included within the

Commission's powers is the authority to "regulat[e] and supervis[e] . . . standards and conditions of service"; section 2303(b)(6) permits the Commission to establish "[r]equirements of standards of safety, and design, comfort, convenience, noise and air pollution control and efficiency in the operation of vehicles and auxiliary equipment"; and section 2303(b)(9) confers authority to "develop[] and effectuat[e] . . . a broad public policy of transportation affected by this chapter as it relates to forms of public transportation in the city, including innovation and experimentation in relation to type and design of equipment, modes of service and manner of operation." The amended Rules at issue plainly fall within those policy guidelines authorized by the New York City Charter.[4]

23. With respect to the second factor, the amended Rules were adopted as part of the Commission's long-standing and previously unchallenged practice of regulating for-hire transportation. The amended Rules, by definition, were not written on a clean slate. These Rules fill in the broad legislative grant of power in section 2303(b)(9). And as explained above, the Commission has been issuing similar rules and regulations for nearly fifty years without any question as to its authority to do so.

---

[4] For these reasons, any independent argument by the plaintiffs that the Commission acted beyond its Charter mandate by promulgating the amended Rules is also unlikely to prevail.

24. The plaintiffs argue that they will prevail on the third factor because section 304 of the ADA and 49 C.F.R. § 37.29(b) preempt the amended Rules. That argument is plainly meritless. As explained above, the amended Rules are not preempted by federal law. The plaintiffs have also failed to adduce sufficient evidence of State and local legislative gridlock on this issue in the face of substantial public debate. The plaintiffs cite six proposed pieces of legislation regarding wheelchair-accessible FHVs. In Boreali, the New York Court of Appeals found that the third factor weighed against constitutionality of an agency's conduct when the legislative deadlock was much more prevalent. See 517 N.E.2d at 1351-52.

25. Finally, there was expertise required to adopt the amended Rules. For example, the Commission needed to use its expertise and knowledge of the FHV industry to be able to assess the viability of requiring FHV bases to dispatch WAVs for certain percentages of their yearly trips.

26. Accordingly, the plaintiffs are unlikely to prevail in arguing that the amended Rules violate New York State separation of powers principles.[5]

---

[5] The defendants urge the Court, in its discretion, to decline to exercise supplemental jurisdiction over the plaintiff's state law claims. Because the Court has not dismissed any of the federal claims at this point and the state law claims plainly arise out of the same case or controversy, the Court will continue to exercise supplemental jurisdiction over all state law claims in this case at this time. See

27. The plaintiffs also raised Equal Protection Clause and Dormant Commerce Clause arguments in their reply brief. These arguments cannot be the basis for a preliminary injunction in this case.

28. The plaintiffs stated in their opening brief that for purposes of the preliminary injunction motion they would not rely on any other claims in their complaint, including violations of the Equal Protection Clause and the Dormant Commerce Clause. See Pl.'s Br. 19-20 n.18 (stating that the plaintiffs "plan on developing" their Equal Protection Clause and Dormant Commerce Clause arguments after discovery). The plaintiffs cannot rely on arguments raised for the first time in reply particularly after they explicitly disclaimed reliance on these arguments in their opening papers. See, e.g., McCarthy v. SEC, 406 F.3d 179, 186-87 (2d Cir. 2005) (refusing to entertain arguments raised for the first time in reply).

29. In any event, the plaintiffs' equal protection claim has little likelihood of success because the Commission's amended Rules do not involve any suspect classifications or interfere with any fundamental rights, and there is plainly a

---

28 U.S.C. § 1367(a); Integrative Nutrition, Inc. v. Acad. of Healing Nutrition, 476 F. Supp. 2d 291, 299 (S.D.N.Y. 2007).

rational basis for the Rules. See, e.g., USA Baseball v. City of New York, 509 F. Supp. 2d 285, 293-95 (S.D.N.Y. 2007).

30. The plaintiffs' dormant commerce clause claim is similarly unlikely to prevail because the amended Rules do not "(1) clearly discriminate[] against interstate commerce in favor of intrastate commerce, (2) impose[] a burden on interstate commerce incommensurate with the local benefits secured, or (3) ha[ve] the practical effect of 'extraterritorial' control of commerce occurring entirely outside the boundaries of the state in question." Janes v. Triborough Bridge & Tunnel Auth., 977 F. Supp. 2d 320, 337 (S.D.N.Y. 2013) (quoting Selevan v. N.Y. Thruway Auth., 584 F.3d 82, 90 (2d Cir. 2009)).

**B.**

31. A preliminary injunction enjoining amended Rules 59A-11(e), 59B-17(c), and 59B-17(d) from taking effect would not be in the public interest. The amended Rules were adopted to further the important government interest of protecting members of the public with disabilities. The amended Rules were adopted in accordance with New York State and New York City law. As the testimony at the evidentiary hearing made clear, the Commission adopted the amended Rules after multiple public hearings, aided by the input of various public interest stakeholders, and as part of a multi-year effort to make FHV transportation available to persons with disabilities. Those factors all weigh heavily in

favor of denying the plaintiffs' eleventh-hour attempt to prevent these Rules from being enforced.

### C.

32. The plaintiffs assert four forms for irreparable harm: amended Rules 59A-11(e), 59B-17(c), and 59B-17(d) violate the plaintiffs' constitutional rights, are cost prohibitive for FHV dispatch bases, will cause FHV drivers of non-WAVs to lose future business, and will cause FHV dispatch bases to lose customer goodwill.

33. "[A] showing of probable irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction." Reuters Ltd. v. United Press Int'l, Inc., 903 F.2d 904, 907 (2d Cir. 1990) (internal quotation marks omitted). A plaintiff must establish "that absent a preliminary injunction [it] will suffer an injury that is neither remote nor speculative, but actual and imminent." Grand River Enters. Six Nations, Ltd. v. Pryor, 481 F.3d 60, 66 (2d Cir. 2007) (internal quotation marks omitted). Furthermore, "[i]rreparable harm is 'injury for which a monetary award cannot be adequate compensation.' " Int'l Dairy Foods Assoc. v. Amestoy, 92 F.3d 67, 71 (2d Cir. 1996) (quoting Jackson Dairy Inc. v. H.P. Hood & Sons, Inc., 596 F.2d 70, 72 (2d Cir. 1979) (per curiam)). If an adequate remedy at law exists, no preliminary injunction may issue. Register.com, Inc. v. Verio, Inc., 356 F.3d 393, 404 (2d

Cir. 2004); see also Marsh USA Inc. v. Karasaki, No. 08-cv-4195, 2008 WL 4778239, at *13 (S.D.N.Y. Oct. 31, 2008).

34. As an initial matter, it is difficult to credit the plaintiffs' argument that they will suffer immediate and irreparable injury without the issuance of a preliminary injunction in view of the length of time that the plaintiffs waited to seek relief. The amended Rules were published on December 20, 2017, following a rulemaking process and public hearings that date back to July, 2017. The plaintiffs waited until March 16, 2018 to file this action and seek a preliminary injunction. A delay of about three months undercuts a showing of immediate and irreparable injury. See, e.g., Ins. Co. of the State of Pa. v. Lakeshore Toltest JV, LLC, No. 15-cv-1436, 2015 WL 8488579, at *3 (S.D.N.Y. Nov. 30, 2015) ("Delay [in bringing a preliminary injunction motion] . . . 'indicates an absence of the kind of irreparable harm required to support a preliminary injunction.' " (quoting Citibank, N.A. v. Citytrust, 756 F.2d 273, 276 (2d Cir. 1985)). Moreover, the Rule about which the plaintiffs direct most of their fire -- the requirement that five percent of the trips dispatched from an FHV base consist of WAVs -- is measured over the course of a year that begins on July 1, 2018, and ends on June 30, 2019. Bases would only be in violation of the Rule if they failed to assign sufficient WAV trips over the course of that year.

35. The plaintiffs have made no effort to explain how the amendments to Rules 59A-11(e) and 59B-17(d) will cause them any harm at all.

36. The amendments to both Rules appear to offer flexibility to FHV drivers and FHV bases to meet requests for WAVs by using the resources of other FHV bases. Neither Rule requires WAVs to be purchased or imposes a quota requirement for WAV trips. These amendments therefore do not impose any new burdens on or causes any harm to the defendants.

37. Accordingly, the plaintiffs have not explained how any harm will flow in the absence of an order enjoining amended Rules 59A-11(e) and 59B-17(d).

**2.**

38. The plaintiffs have not established that they will suffer irreparable harm <u>per se</u> because the amended Rules violate their constitutional rights.

39. An alleged violation of a constitutional right can "trigger[] a finding of irreparable harm." <u>Jolly</u>, 76 F.3d at 482. However, courts have often refused to find that a violation of the Supremacy Clause triggers irreparable harm <u>per se</u> because the Supremacy Clause is a structural provision of the Constitution that does not confer personal rights. <u>See, e.g.</u>, <u>EEOC v. Local 638</u>, No. 71-cv-2877, 1995 WL 355589, at *5

(S.D.N.Y. June 7, 1995) ("[A] Supremacy Clause violation allegedly caused by the enforcement of state regulations that may have been preempted by federal law could not constitute per se irreparable harm."). The same logic would likely hold with respect to any supposed Guarantee Clause violations. And in any event, as explained above, the plaintiffs' arguments that the amended Rules violate the Supremacy Clause and the Guarantee Clause are not persuasive. Neither are the plaintiffs' arguments that the amended Rules violate the Equal Protection Clause, the Due Process Clause, and the Dormant Commerce Clause, to the extent those arguments have been properly raised on this motion.

40. The plaintiffs have therefore failed to allege a violation of a constitutional right sufficient to trigger a finding of irreparable harm per se.

**3.**

41. The plaintiffs argue that the Commission's amendment to Rule 59B-17(c) that requires five percent of a dispatch base's yearly trips to go to WAVs is cost prohibitive and will therefore cause irreparable harm by forcing many for-hire dispatch bases into bankruptcy.

42. The defendants respond by arguing that amended Rule 59B-17(c) cannot be cost prohibitive because it does not actually impose any costs; it merely requires dispatch companies to dispatch more wheelchair-accessible trips.

43. Dr. Kabessa explained persuasively in his testimony at the evidentiary hearing that amended Rule 59B-17(c) will necessarily impose on dispatch companies the cost of purchasing and maintaining WAVs. Dr. Kabessa testified that FHV dispatch bases do not normally own their own FHVs and instead rely on individual FHV owners and drivers who affiliate with the bases. Those drivers, in Dr. Kabessa's experience, are unlikely to purchase WAVs because WAVs are too costly. Blecher confirmed that he cannot afford to replace his non-WAV with a WAV. See also Blecher Decl.. ¶ 5. As a result, in order to ensure that they comply with amended Rule 59B-17(c), Dr. Kabessa explained that dispatch companies will have to purchase WAVs themselves, which fundamentally alters their normal business model, and dispatch those vehicles. That will also involve hiring drivers to drive the new WAVs and possibly hiring internal staff to support those drivers, none of which dispatch bases currently do according to Dr. Kabessa's testimony. That result appears to be consistent with the apparent intent of the Rule to place the costs of increasing the number of WAVs dispatched by FHV bases on the operators of those bases.

44. The defendants have offered no evidence to rebut the plaintiffs' explanations of the costs associated with amended Rule 59B-17(c). The defendants argue that no dispatch base is required to comply with Rule 59B-17(c) because the base could

simply join the alternative pilot program. But the parties agree that the pilot program cannot exist without at least one WAV Dispatcher, and as of the date of the hearing, the Commission has yet to approve a WAV Dispatcher. Thus, at this point, the pilot program has not been shown to be a viable alternative.

45. The defendants also argue that any costs associated with WAVs are compensable economic damages and therefore not a basis for a preliminary injunction.

46. It is true that economic harm ordinarily is not irreparable harm for purposes of a preliminary injunction motion. See Int'l Dairy Foods Assoc., 92 F.3d at 71. However, courts have occasionally concluded that there may be irreparable harm when a plaintiff alleges economic damages that will force the plaintiff into bankruptcy. See, e.g., Stallworth v. Joshi, No. 17-cv-7119, 2017 WL 8777378, at *3 (S.D.N.Y. Nov. 22, 2017) (citing Shady v. Tyson, 5 F. Supp. 2d 102, 109 (E.D.N.Y. 1998)).

47. The economic harm may be severe here. Dr. Kabessa testified that the costs associated with amended Rule 59B-17(c) would be significant. He testified that amended Rule 59B-17(c) would cause his FHV base company -- the largest in New York City by far -- significant losses in the first year it is in effect and will put his company out of business if it remains in effect for a second year because of the number of WAVs the amended Rule would require his company to purchase to ensure that five

29

percent of the trips dispatched were serviced by WAVs. He also testified that amended Rule 59B-17(c) will put many smaller livery FHV dispatch base companies with which he is familiar out of business entirely in the first year the Rule is in effect because of the need to purchase WAVs. These estimates are somewhat speculative because they ignore the possibility that individual FHV bases will join the pilot program, provided that the Commission gets around to implementing it. The estimates also ignore the effects of added flexibility supplied by the amendments to Rules 59A-17(c) and 59B-17(d). But it is plainly true that the economic impact of providing more WAVs for the FHV industry will fall on the FHV bases.

48. The defendants did not submit any evidence to rebut the plaintiffs' cost estimates.

**4.**

49. The plaintiffs argue that individual owners and drivers of FHVs that are not WAVs will suffer irreparable harm because they will be ineligible going forward for a certain percentage of the trips dispatched by their affiliated base, relying primarily on Blecher's testimony. This is likely not a sufficient showing of irreparable harm because future profits are often compensable economic damages. See, e.g., Tom Doherty Assocs., Inc. v. Saban Entm't, Inc., 60 F.3d 27, 38 (2d Cir. 1995) ("Generally, where we have found no irreparable harm, the

30

alleged loss of goodwill was doubtful, and lost profits stemming from the inability to sell the terminated product could be compensated with money damages determined on the basis of past sales of that product and of current and expected future market conditions."). Moreover, there is no credible evidence that Blecher would be required to purchase a WAV.

**5.**

50. The plaintiffs also argue that they will lose the goodwill of any customers who order a non-WAV and receive a WAV instead.

51. Jeffrey Rose, the president of a trade association for luxury limousine operators, asserts that members of his association will suffer irreparable damage because "[i]f a customer requests a sedan and a . . . luxury limousine base sent a WAV instead of a luxury sedan, not only would the customer not be satisfied, but it is highly likely that the customer might never use the service of that luxury limousine base again." Rose Decl. ¶¶ 1, 5. Dr. Kabessa testified that his organizations will suffer irreparable harm because in a survey of his company's customers thirty-two percent of the respondents said they would never use an FHV base again if the respondent ordered a sedan and the base sent a WAV instead. See also Kabessa Decl. ¶ 20. There is no evidence that this survey was scientifically conducted but the defendants offered no contrary evidence.

Indeed, the defendants have offered no evidence at all to rebut the plaintiffs' allegations regarding loss of goodwill.

**D.**

52. The plaintiffs raise some substantial issues with respect to the economic burdens that the amended Rules may place on them. However, economic costs for FHV bases are to be expected from a Rule that attempts to increase the number of WAVs available to disabled riders and to place the costs of obtaining those vehicles on the operators of FHV bases. The wisdom of that decision is not for the Court, so long as the Commission did not act unlawfully in amending its Rules to require the FHV bases to provide such vehicles in the manner that it did. The amended Rules plainly further an important public interest -- making FHV transportation available to the disabled. The plaintiffs have not shown that they have a likelihood of success in establishing that the Commission acted unlawfully in adopting the amended Rules. Therefore, the plaintiffs have not shown that they are entitled to a preliminary injunction.

**CONCLUSION**

The foregoing constitutes the Court's Findings of Fact and Conclusions of Law pursuant to Rules 52(a) and 65 of the Federal Rules of Civil Procedure. The Court has considered all of the arguments of the parties. To the extent not specifically

addressed above, any remaining arguments are either moot or without merit. For the reasons explained above, the plaintiffs' motion for a preliminary injunction is **denied**.

**SO ORDERED.**

Dated:     **New York, New York**
              **April 18, 2018**

                             **John G. Koeltl**
                   **United States District Judge**